UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
WACHOVIA BANK NATIONAL                          :
ASSOCIATION, as agent for the Risk Participants, :
                                                :
                                  Plaintiff, :        09 Civ. 1262 (PAC)
                                                :
              - against -                       :        <u>MEMORANDUM</u>
                                                :        <u>OPINION & ORDER</u>
ENCAP GOLF HOLDINGS, LLC, THE BANK              :
OF NEW YORK MELLON, as Trustee for the          :
Benefit of the holders of the Bonds, and        :
LEXINGTON INSURANCE COMPANY,                    :
                                                :
                                  Defendants. :
                                                :
THE BANK OF NEW YORK MELLON,                    :
                                                :
                                  Crossclaimant, :
                                                :
              - against -                       :
                                                :
ENCAP GOLF HOLDINGS, LLC, and                   :
LEXINGTON INSURANCE COMPANY,                    :
                                                :
                          Crossclaim Defendant. :
                                                :
LEXINGTON INSURANCE COMPANY,                    :
                                                :
                  Counterclaimant/Crossclaimant, :
                                                :
              - against -                       :
                                                :
WACHOVIA BANK NATIONAL                          :
ASSOCIATION, as agent for the Risk Participants, :
THE BANK OF NEW YORK MELLON, as                 :
Depository and as Trustee for the benefit of the :
holders of the Bonds, ENCAP GOLF HOLDINGS, :
LLC, MACTEC DEVELOPMENT                         :
CORPORATION, CHEROKEE LOAN II,                  :
SFT I, INC, and WELLS FARGO BANK                :
NATIONAL ASSOCIATION,                           :
                                                :
                  Counterclaim/Crossclaim Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/19/10

HONORABLE PAUL A. CROTTY, United States District Judge:

This litigation arises out of an endeavor to close four landfills located in New Jersey's Meadowlands, and upon closure, build golf courses, residences and a hotel on the remediated land. Bonds were issued, and hundreds of millions of dollars raised and spent; but the developer has defaulted, spawning litigation in several fora amongst various parties seeking to mitigate their losses. The dispute here is over $42,308,322.80 of remaining bond proceeds. The Court must decide who is entitled to the money.

EnCap Golf Holdings, LLC ("EnCap") is the developer who was to close the landfills. EnCap received financing through, among other sources, a series of bonds issued by the New Jersey Environmental Infrastructure Trust ("NJEIT"). As security for EnCap's obligation to repay the bonds, and to enhance their marketability, Wachovia Bank National Association ("Wachovia") issued a letter of credit on behalf of syndicate of banks in favor of The Bank of New York Mellon ("BNY"), the trustee under the bond indenture. After EnCap defaulted under the indenture, and various other agreements, the bonds were called for mandatory purchase funded by draws on the letter of credit. As a result, Wachovia is now the sole bondholder.

Lexington Insurance Company ("Lexington"), a subsidiary of American International Group, Inc. ("AIG"), was the cost-overrun insurer for the project. Pursuant to an insurance contract issued by Lexington to EnCap, if the cost of closing the landfills exceeded the funds available from the bonds, Lexington would be responsible for up to $35 million. Lexington's fellow AIG subsidiary, American Home Assurance Company ("AHA"), is the surety for the project, but is not a party to this action.

2

The bond proceeds available for paying the costs of the closing the landfills were placed in a deposit account at BNY, where they are currently held by BNY as depository under a contract, known as the "Deposit Agreement," between EnCap, Lexington and BNY. Under the Deposit Agreement, Lexington is empowered to authorize payments made from the bond proceeds for work done in connection with the project. MACTEC Development Corporation (MACTEC), the remediation contractor hired by EnCap was, under certain circumstances, entitled to payment for its work from the bond proceeds.

Wachovia instituted this action against EnCap, BNY and Lexington seeking a declaratory judgment that it is entitled to the bond proceeds as the holder of the bonds and as the issuer of the letter of credit. EnCap has not responded to the Complaint or any other pleading, and is in default. While BNY is named as the defendant, it is aligned with Wachovia and has asserted crossclaims against EnCap and Lexington for a declaration that as the indenture trustee it is entitled to use the bond proceeds to pay Wachovia. Lexington takes the position that under the Deposit Agreement, it controls the bond proceeds, which cannot be removed from the deposit account until the Deposit Agreement expires in March, 2013.

Lexington asserts counter and crossclaims against Wachovia, BNY and EnCap seeking a declaration that Wachovia and BNY are prohibited from removing the bond proceeds from the deposit account and that the two banks' security interests in the proceeds are not perfected. Lexington also asks the Court to declare that BNY has waived the forum selection clause in the Deposit Agreement. In addition to its claims against Wachovia, BNY and EnCap, Lexington has joined, and asserted declaratory judgment counterclaims against, MACTEC, Cherokee Loan II, LLC ("Cherokee"), SFT

I, Inc. ("SFT") and Wells Fargo Bank, N.A. ("Wells Fargo"). Despite Lexington asserting claims against MACTEC, Lexington and MACTEC share the common goal of preventing Wachovia and BNY from removing the bond proceeds from the deposit account.

There are three motions for summary judgment pending. Lexington moves for partial summary judgment on the second of its three declaratory judgment claims seeking a declaration that BNY has waived the forum selection clause in the Deposit Agreement. Lexington says that if the Court finds that BNY has waived enforcement of the forum selection clause, it intends to move for the Court to abstain from hearing this action in favor of an action pending in New Jersey state court. Wachovia moves for summary judgment on all six of its declaratory judgment claims. BNY likewise moves for summary judgment on all three of its declaratory judgment claims. From the parties joined by Lexington, only MACTEC has responded to the motions, and it has only responded to Wachovia's motion for summary judgment.

For the reasons that follow, Lexington's motion for partial summary judgment is denied. BNY has not waived enforcement of the forum selection clause in the Deposit Agreement. This dispute will be decided here in New York, which is what the forum selection clause provides. Wachovia's and BNY's motions for summary judgment are granted. Wachovia and BNY have security interests in the bond proceeds, and as secured creditors, they have superior rights to funds. Indeed, Lexington concedes that it has no interest in the bond proceeds, and while MACTEC may be entitled to payment for work it has done in closing the landfills, any rights it has are inferior to those of Wachovia and BNY.

## BACKGROUND

**I. Facts**[1]

**A. The Project**

In 2000, EnCap began the Meadowlands Golf Course Redevelopment Plan Project ("the Project"), which consisted of the filling, remediation and closure of four solid waste landfills on approximately 785 acres in New Jersey's Meadowlands ("the Project Site"). On or about October 26, 2000, EnCap entered into a Landfill Closure and Development Agreement (the "Development Agreement") with the New Jersey Meadowlands Commission ("NJMC"). (Declaration of Richard M. Knight ("Knight Decl.") ¶ 2; Third Amended And Restated Landfill Closure and Development Agreement, Declaration of Marc L. Greenwald ("Greenwald Decl."), Ex. 1.) The Development Agreement gives EnCap the right to remediate and develop the four landfills, and also imposes certain obligations on the company. (Knight Decl. ¶2.) Once EnCap completed the Project, and the associated environmental remediation, the Project Site was to be sold to vertical developers who were to construct two golf courses, single and multi-family residences, and a hotel. (Id. ¶ 2.)

Prior to entering the Development Agreement, in September, 2000, EnCap approached AIG Environmental ("AIGE") – the entity responsible for underwriting certain of the insurance policies and surety bonds issued by AIG subsidiaries – about providing environmental insurance coverage for its remediation and development of the landfills. (Declaration of Kenneth Radigan ("Radigan Decl.") ¶ 4; Declaration of Robert

---

[1] The facts, which are generally agreed upon, are derived from the relevant documents, agreements and affidavits submitted by the parties.

E. Staples ("Staples Decl.") ¶ 2.) After discussions between AIGE and EnCap, in December, 2000, EnCap asked AIGE to provide a surety bond to guarantee completion of the Project. (Id.) The following month, AIGE informed EnCap that, subject to underwriting, AIGE was interested in providing the Project's insurance and surety program. (Id. ¶ 5.) After a series of correspondences between EnCap and AIGE regarding how the insurance coverage would be structured, the two companies entered into a binding commitment letter on June 29, 2001. (Commitment Letter, Radigan Decl., Ex. 6.) While the commitment letter states that AIGE and EnCap are bound as of June 29, 2001, the letter provides that the insurance policy will not be issued until the Project is fully financed. (Id.)

Around the same time EnCap entered into the commitment letter with AIGE, Lexington issued the EnCap Solid Waste-Closure Policy ("Lexington Policy"), with an effective date of December 21, 2001. (Lexington Policy, Radigan Decl., Ex. 7.) The Lexington Policy had a $104,842,500 liability limit, and the premium, which EnCap paid as the insured, was $89,128,117. (Id.; Radigan Decl. ¶ 13.) According to former AIGE vice president Kenneth Radigan ("Radigan"), the Lexington Policy was structured so that the funding for the Project would serve as collateral for the surety bond AIGE had committed to issuing. (Radigan Decl. ¶ 14.) Radigan asserts that "Lexington could only be made to give up control over the funds serving as security for bonds issued by an AIG company if EnCap first obtained the release of those bonds." (Id.)

In April, 2004, the NJMC conveyed fee simple title subject to a condition subsequent to the Project Site to EnCap by way of a Phase I Site Quitclaim Deed ("Phase I Deed"). (Amended and Restated Phase I Quitclaim Deed, Declaration of Marc L.

Greenwald ("Greenwald Decl."), Ex. 2.) The reversion clause of the Phase I Deed states

that the conveyance "is expressly subject to a condition subsequent that . . . [in the event

of EnCap's default under certain covenants] title shall revert to Grantor, its successors

and assigns, subject to the Amended Development Agreement." (Id. § 11.) On May 3,

2004, AHA executed, as surety, Bond # ESD 731 5040 in the amount of $148,824,299 in

favor of the NJMC as obligee ("Surety Bond"). (Surety Bond, Staples Decl., Ex. 1.) The

Surety Bond names EnCap as principal, and according to the affidavit of AHA vice

president Robert Staples, "[i]n issuing the Surety Bond, American Home relied upon the

understanding that, in the event American Home was called to perform, the proceeds of

the . . . [Lexington Policy] would be available to exonerate American Home." (Staples

Decl. ¶ 5.)

EnCap hired MACTEC to provide labor, services and materials as remediation

contractor for the Project. To this end, EnCap and MACTEC entered into a Second

Amended and Restated Agreement for Design and Construction Services Relating to the

Meadowlands Landfill Closure Project (the "MACTEC Contract") on July 29, 2005.

(MACTEC Contract, Declaration of John A. Hager ("Hager Decl."), Ex. A, A-1.) The

MACTEC Contract provides for MACTEC to submit payment applications for completed

work to EnCap and Lexington. (Id. § 7.05.) If EnCap approves of the application for

payment, such approval is to be certified to Lexington and Lexington is to pay MACTEC

within thirty-five days. (Id. §§ 7.05 and 7.06.) The MACTEC contract also requires

EnCap to obtain various forms of insurance. (Id. § 9.01(a).) Section 9.01(g) of the

agreement states that EnCap "will provide evidence to MACTEC that . . . the Solid

Waste Closure Policy encompassing and providing coverage for this Second Amended

Agreement and the related Scope of Work Document, was and is in effect and includes therein the following language providing to MACTEC a direct right of action against the Insurer: [setting forth language for the policy]." (Id. § 9.01(g).)

In 2001, EnCap financed the project through a series of complex financial transactions, and in 2004, the Project was refinanced. (Radigan Decl. ¶ 15.) In 2001 and 2004, EnCap obtained financing through bonds issued by the New Jersey Economic Development Authority. (Id.) In 2005, EnCap sought to refinance the Project to take advantage of loan programs sponsored by the State of New Jersey, including the New Jersey Environmental Infrastructure Trust Program ("the Program"). (Id.) The Program provides funding from the State of New Jersey, acting through the New Jersey Department of Environmental Protection ("NJDEP"). (Id.)

**B. The December, 2005 Refinancing**

On December 1, 2005, a number of agreements were entered into to effect EnCap's refinancing. The agreements, which are set forth below, are at the heart of this litigation.

The money in dispute is the proceeds of a series of bonds issued by the NJEIT; namely, the Environmental Infrastructure Revenue Bonds (Bergen County Improvement Authority – EnCap Golf Holdings, LLC Project) Series 2005, in the aggregate principal amount of $107,015,000, with interest set forth therein (the "NJEIT 2005A Bonds"). (Knight Decl. ¶ 3.) The NJEIT 2005A Bonds were issued pursuant to an Indenture of Trust (the "NJEIT Indenture") between the NJEIT and BNY, naming BNY as indenture trustee. (NJEIT Indenture, Knight Decl., Ex. 1.) The NJEIT Indenture creates, and orders BNY to establish, a number of trust funds, and accounts and subaccounts within

the funds. (Id. § 5.02.)  Among the trust funds and accounts created are the "Project

Fund," and within the Project Fund, the "2005 NJEIT Bonds Account." (Id. § 5.02(b).)

BNY is also empowered to "establish such other accounts within each of the funds, or

subaccounts within each of the accounts, as it considers advisable to identify the source

or nature of the amounts in such funds." (Id. § 5.02.)

The NJEIT Indenture grants BNY, as indenture trustee, and Wachovia, as "Credit

Facility Provider" and bondholder, security interests in the bond proceeds and in the

funds and accounts created under the indenture.  At its outset, the NJEIT Indenture

provides:

> **NOW, THEREFORE, THIS INDENTURE WITNESSETH** that to
> secure (a) all obligations under this Indenture, including, without
> limitation, (i) the payment of the principal, redemption price or purchase
> price of and interest on the 2005 NJEIT Bonds, (ii) the payment of any
> Credit Facility Parity Obligations (as hereinafter defined) . . . the Trust
> does hereby sell, assign, transfer, set over and pledge unto (1) the Trustee,
> its successors in the trust and its assigns forever, for the benefit of the
> Bondholders of the 2005 NJEIT Bonds, (2) the Credit Facility Provider, as
> holder of any Credit Facility Parity Obligations . . . a security interest as
> hereinafter set forth to the extent of their respective interests therein:

> **GRANTING CLAUSE**

> The 2005 NJEIT Bonds Pledged Rights and Revenues, (a) for the Trustee .
> . . for the equal and proportionate benefit, security and protection of all
> present and future Bondholders of the 2005 NJEIT Bonds, from time to
> time, issued under and/or secured by this Indenture . . . (b) for the Credit
> Facility Provider, as holder of any Credit Facility Parity Obligations, to
> the respective extent of its interests therein as provided by the terms of this
> Indenture . . . .

> **TO HAVE AND TO HOLD** the same and any other revenues, property,
> contracts or contract rights, accounts receivable, chattel paper,
> instruments, general intangibles or other rights and the proceeds thereof,
> which may, by delivery, assignment or otherwise, be subject to the lien
> and security interest created by this Indenture.

(Id. at 7-8.)  In turn, "2005 NJEIT Bonds Pledged Rights and Revenues" is defined to

include "all moneys and investments, including earnings thereon, held by the Trustee in

the 2005 NJEIT Bonds Accounts . . . ."  (Id. at 32.)  "2005 NJEIT Bonds Accounts," are

those "accounts within funds and the subaccounts within accounts established hereunder

in connection with the 2005 NJEIT Bonds and bearing the designation '2005 NJEIT

Bonds' with the name of the appropriate account or subaccount, as the case may be,

appended thereto."  (Id.)

Section 5.01 of the NJEIT Indenture provides that payments on the NJEIT 2005A

Bonds are to be made from the 2005 NJEIT Bonds Pledged Rights and Revenues, and

that payments received on the loan made out of the bond proceeds are to be remitted to

BNY as trustee for the account of the NJEIT and deposited as provided for in the

indenture.  (Id. § 5.01.)  After directing BNY as trustee to establish the funds, accounts

and subaccounts, § 5.02 of the indenture states that:

> The moneys and investments from time to time in the funds, accounts and
> subaccounts established hereunder shall be trust funds under the terms
> hereof and shall not be subject to any lien (other than the lien of this
> Indenture) or attachment by any creditor of the Trust.  Such moneys and
> investments . . . shall be held by the Trustee, until disbursed as authorized
> by this Article V, in trust for the benefit of (i) the Credit Facility Provider
> to the extent provided herein,  . . . (iii) the Trustee (as provided in Section
> 9.02 hereof) and (iv) the Holders from time to time of the Bonds issued
> and Outstanding under this Indenture, to the extent provided herein, and
> shall be subject to a lien and charge for the further security of the Credit
> Facility Provider (to the extent provided herein) . . . the Trustee and the
> Holders . . . .

(Id. § 5.02.)

Section 5.03 provides that the funds initially held in the 2005 NJEIT Bonds

Account of the Project Fund are a portion of the proceeds of the NJEIT 2005A Bonds,

and that except as provided in Article VIII, "Defaults and Remedies," the proceeds shall

be used for paying the costs of the Project. (Id. § 5.03.)  Article VIII mandates that with

an "Event of Default," all funds received by BNY as trustee shall be applied to pay the

unpaid principal and interest on the NJEIT 2005A Bonds, in addition to other obligations.

(Id. § 8.07.)  Finally, § 5.23 states:

> Notwithstanding anything herein to the contrary, to the extent that moneys
> are not otherwise available to pay the principal of, premium, if any, or
> interest on the Bonds which are required to be paid under the terms of this
> Indenture . . . the Trustee shall, without the need for further authorization
> or approval, transfer such moneys as are necessary to make such payment
> from the Project Fund and the Debt Service Reserve Fund, in that order, to
> the Debt Service Fund.  The Trustee shall liquidate such investments as it
> deems necessary to make such transfer and shall give such notices as are
> necessary in connection therewith.

(Id. § 5.23.)

The proceeds of the NJEIT 2005A Bonds were used by the NJEIT to make a

$107,015,000 loan to the Bergen County Improvement Authority ("BCIA") pursuant to

the Loan Agreement (the "BCIA Trust Loan Agreement") entered into by the NJEIT, the

BCIA and EnCap.  (BCIA Trust Loan Agreement, Knight Decl., Ex. 2.)  Pursuant to the

BCIA Trust Loan Agreement, the $107,015,000 was in turn loaned to EnCap.  (Id.;

Knight Decl. ¶ 4.)  EnCap used the funds to repay certain pre-existing bond obligations

and to fund remediation of the Project Site.  (NJEIT Indenture at 6, Knight Decl., Ex. 1.)

More specifically, $61,150,154 was to be used for paying the costs of the Project, and the

remainder was used to retire previously issued bonds.  (Id. at 5.)  The BCIA Trust Loan

Agreement, and the Series 2005A Promissory Note ("Series 2005A Note") executed by

EnCap, require EnCap to make periodic payments on the loan from the BCIA.  (BCIA

Trust Loan Agreement at 7, Knight Decl., Ex. 2; Series 2005A Note at 1, Affidavit of

David Kerr ("Kerr Aff."), Ex. E.)

In connection with the refinancing, the BCIA issued Special Purpose Limited Obligation Revenue Bonds (EnCap Golf Holdings, LLC Project), Series 2005, in an aggregate principal amount of $37,985,000 (the "BCIA 2005B Bonds") (collectively with the NJEIT 2005A Bonds, the "Bonds"). The BCIA 2005B Bonds were issued pursuant to an Indenture of Trust (the "BCIA Indenture") naming Commerce Bank, N.A. as trustee. (BCIA Indenture, Knight Decl., Ex. 3.) Wells Fargo has since been substituted as trustee under the BCIA Indenture. (Knight Decl. ¶ 6.)

As security for the Bonds, and to enhance their marketability, Wachovia issued two letters of credit ("Letters of Credit") on behalf of a syndicate of banks. One letter of credit, in the aggregate amount of $108,042,000, was issued in favor of BNY as the indenture trustee for the NJEIT 2005A Bonds; the other, in the aggregate amount of $38,350,000, was issued in favor of the indenture trustee for the BCIA 2005B Bonds. (Irrevocable Direct Pay Letters of Credit Nos. SM216949W and SM216950W, Knight Decl., Ex. 4, 5.) The Letters of Credit were issued by Wachovia for EnCap's account as a direct repayment source for the principal and interest on the Bonds. (Knight Decl. ¶ 7.)

The Reimbursement and Security Agreement ("Reimbursement Agreement") entered into by EnCap and Wachovia sets forth EnCap's unconditional obligation to reimburse Wachovia for any draws made on the Letters of Credit. (Reimbursement Agreement, Knight Decl., Ex. 6.) Under § 2.6 of the Reimbursement Agreement, EnCap agrees to pay Wachovia "immediately after and on the same Business Day as any amount is drawn and paid under a Letter of Credit, a sum equal to the amount so drawn." (Id. § 2.6.) Upon an "Event of Default," as defined in Article VIII, Wachovia is empowered to declare all amounts owing under the Reimbursement Agreement due and payable and,

with notice to the NJEIT Indenture trustee (BNY) and the BCIA Indenture trustee (Commerce Bank or Wells Fargo), accelerate the Bonds pursuant to the NJEIT and BCIA Indentures and require that the Bonds be tendered for mandatory purchase. (Id. § 8.2.) As security for "the payment and performance when due of . . . [EnCap's] Reimbursement Obligations," § 9.1 of the Reimbursement Agreement pledges all of EnCap's "right, title and interest to, and hereby grants to the Agent [Wachovia] a first lien on, and security interest in . . . the 'Pledged Bond Collateral.'" (Id. § 9.1.) The Pledged Bond Collateral includes: "(i) all Pledged Bonds; (ii) all income, earnings, profits, interest, premium or other payment in whatever form in respect of the Pledged Bonds; and (iii) all proceeds (cash and non-cash) arising out of the sale, exchange, collection, enforcement or other disposition of all or any portion of the Pledged Bonds." (Id.) Section 1.1 defines "Pledged Bonds," as "those Bonds which have been purchased from moneys drawn on a Letter of Credit pursuant to Section 9.18(c) of the applicable Indenture." (Id. § 1.1.) Section 9.18(c) of the NJEIT Indenture provides that: "Bonds purchased with monies drawn on the Credit Facility shall be owned by the Credit Facility Provider [Wachovia] as Pledged Bonds." (NJEIT Indenture § 9.18(c), Knight Decl., Ex. 1.)

As further security for EnCap's obligations to Wachovia under the Reimbursement Agreement, EnCap executed a Mortgage Security Agreement (the "Mortgage") pledging its right and title to the Project Site to Wachovia. (Knight Decl. ¶ 9; Lexington's Response to Wachovia's Rule 56.1 Statement ¶ 9.)

In connection with the December 1, 2005 refinancing, EnCap cancelled the Lexington Policy in order to obtain a return premium of approximately $60 million.

(Radigan Decl. ¶ 17.) In place of the funded Lexington Policy, Lexington issued EnCap the unfunded traditional risk EnCap Solid Waste Closure Policy ("Closure Policy"). (Closure Policy, Radigan Decl., Ex. 9.) Under the Closure Policy, Lexington provides coverage of up to $35 million for "EIT Closure Costs" above a self-insured retention ("SIR") of approximately $128 million. (Id. at 1-2.) The policy defines "EIT Closure Costs," as "reasonable and necessary closure costs that are eligible for funding under the NJEIT Program payable from the Series A Bonds and from the proceeds of the NJDEP Fund Loan and which are costs for EIT Closure Work." (Id. § 5(R).) Fifty percent of the SIR was funded by the loan made out of the proceeds of the NJEIT 2005A Bonds, and the other fifty percent was funded by a loan from the NJDEP. (Radigan Decl. ¶ 17.)

In addition to replacing the Lexington Policy with the Closure Policy, EnCap entered into the NJEIT/Trust Closure Costs Deposit and Payment of Claim Agreement ("Deposit Agreement") with Lexington and BNY. (Deposit Agreement, Knight Decl., Ex. 8.) Lexington was made a party to the Deposit Agreement because of its role as cost-overrun insurer for the Project. (BNY Rule 56.1 Statement ¶ 30; Lexington's Response to BNY's Rule 56.1 Statement ¶ 30.) Section 2.01 of the Deposit Agreement states that BNY, as "Depository," has created an account in EnCap's name designated the NJEIT Series A Deposit Account (the "Deposit Account") and that the Deposit Account shall be maintained by BNY on behalf of EnCap. (Deposit Agreement § 2.01, Knight Decl., Ex. 8.) The Deposit Agreement goes on to state that "[u]pon the receipt of the 'net' NJEIT Series A Bond proceeds from the Trustee [BNY], the Depository [also BNY] shall deposit in the Deposit Account $61,158,154 (such amount being equal to the 'net' NJEIT Series A Bond Proceeds and constituting the initial deposit in the Deposit Account.[)]"

(<u>Id.</u>) Out of the initial deposit, $42,308,322.80 of the proceeds from the NJEIT 2005A Bonds (the "Bond Proceeds") remain in the Deposit Account today. (Knight Decl. ¶ 14; Lexington's Response to Wachovia's Rule 56.1 Statement ¶ 14.)

Both the NJEIT Indenture and the Deposit Agreement set forth mechanisms for payment of requisitions for work done on the Project. Section 5.05 of the NJEIT Indenture authorizes BNY to pay requisitions from the Project Fund, "but only upon receipt of a Requisition, substantially in the form of, and containing all of the information and representations set forth in, Exhibit B-1 attached hereto and made a part hereof . . . ." (NJEIT Indenture § 5.05(a)(ii), Knight Decl., Ex. 1.) Exhibit B-1, titled "Form of Requisition," requires, among other things, EnCap's certification that "No Event of Default (as defined in the BCIA Trust Loan Agreement or the BCIA Fund Loan Agreement, respectively) has occurred and is continuing under the BCIA Trust Loan Agreement or the BCIA Fund Loan Agreement." (<u>Id.</u> at B-1.) Further, before paying any requisitions out of the Project Fund, the NJEIT Indenture requires BNY as trustee to obtain the authorization of a series of parties, including the NJEIT, the NJDEP and AIG. (<u>Id.</u> § 5.05(a)(iii).)

As cost-overrun insurer, Lexington is empowered by the Deposit Agreement to authorize the payment of requisitions from the Deposit Account. (Deposit Agreement at 1-2, Knight Decl., Ex. 8.) Section 9.15 of the Deposit Agreement requires, however, that contractors "submit all applications for payment to the Company [Lexington] in the form required under the applicable Schedule Closure Contract and as required under the Bond Documents [including the NJEIT Indenture], simultaneously with their submission to EnCap." (<u>Id.</u> § 9.15.) And Lexington agreed "that it will not make any . . . payment until

the necessary approvals (and evidence thereof) have been received by the Company from NJEIT, as required under the Bond Documents." (Id.) Thus, under the Deposit Agreement, Lexington cannot pay requisitions, unless EnCap certifies that it is not in default. If EnCap is in default, however, BNY and Wachovia are authorized, but not obligated, to submit requisitions in EnCap's stead. (Id. § 5.05.) The Deposit Agreement further authorizes EnCap, under certain conditions, to assign its rights to the NJMC. (Id. § 9.05.)

Central to this dispute is § 2.01 of the Deposit Agreement, which in pertinent part reads:

> Until such time (if at all) as the Depository [BNY] shall have received notice from the Trustee [BNY as NJEIT Indenture trustee] of the occurrence of a Default by the Company [Lexington] under the provisions of Section 7.01 hereof, the Depository shall, if and as directed (in writing) by the Company and without further consent of EnCap, (i) comply with all payment instructions provided by the Company with respect to the payment or other disposition of the Investment Securities or amounts otherwise on deposit in the Deposit Account from time to time, (ii) disregard any Instructions that may be received from EnCap from time to time with respect to the Deposit Account and/or disposition of the Investment Securities or amounts otherwise on deposit in the Deposit Account from time to time, and (iii) otherwise deal with the Deposit Account as directed in writing by the Company.

(Id. § 2.01.) While Lexington contends that it is not in default under the Deposit Agreement, it concedes that it "did not obtain a property interest in the funds on deposit in the Deposit Agreement through its execution of the Deposit Agreement." (BNY Rule 56.1 Statement ¶ 32; Lexington's Response to BNY's Rule 56.1 Statement ¶ 32.)

The Deposit Agreement recognizes that BNY and Wachovia are secured creditors under the various agreements entered into on December 1, 2005 in connection with the refinancing. Section 1.01(69) defines "Secured Parties" to include Wachovia, as the

"Letter of Credit Bank," and BNY, as the "Trustee" under the NJEIT Indenture. (Deposit Agreement § 1.01(69), Knight Decl. Ex. 8.) Prior to setting forth Lexington's right to issue directions to BNY with respect to the Bond Proceeds in the Deposit Account, § 2.01 states that "[a]ny Investment Securities . . . purchased [with the Bond Proceeds] shall be held by the Depository for the benefit of EnCap, the Company and the Secured Parties." (Deposit Agreement § 2.01, Knight Decl., Ex. 8.) Article V of the Deposit Agreement is titled, "Rights and Duties of Secured Parties." (Id. at 28.) Section 5.01, "Rights Upon Occurrence of Event of Default," provides:

> During the period that any NJEIT Series A Bonds remain outstanding, in the event that a Bond Event of Default has occurred, giving rise to certain rights and remedies being exercised by the Directed Secured Parties [Wachovia] and the Trustee [BNY], against the collateral provided by EnCap (including without limitation, this Agreement), the Trustee shall provide written notice of such Bond Event of Default to the Company. Thereafter, the Directed Secured Parties and the Trustee shall have the right (but not the obligation) to exercise the rights otherwise provided to EnCap under this Agreement, including the right to submit Claims for NJEIT/Trust Closure Work. From and after the date that the written notice described above has been provided, the Company agrees to recognize the Directed Secured Parties and the Trustee and to afford the Directed Secured Parties and the Trustee, the same rights under this Agreement as are provided or afforded to EnCap.

(Id. § 5.01.) "Bond Event of Default" is defined as an 'Event of Default' as defined in the Indenture with respect to the NJEIT Series A Bonds." (Id. § 1.01(7).)

While § 9.18 of the Deposit Agreement provides that, except as set forth in §9.05 regarding permitted assignments, there are no third-party beneficiaries to the agreement, § 9.08 affords MACTEC the right to pursue claims against Lexington for unpaid closure work "as if MACTEC were EnCap." (Id. § 9.08.) By its terms, the Deposit Agreement expires "upon the earlier to occur of: (a) payment of Claims for NJEIT/Trust Closure Work in an amount Equal to the NJEIT/Trust Closure Costs Cap Amount, or (b) March

21, 2013 at 12:01 a.m." (Id. § 6.01.) Upon the Deposit Agreement's expiration, "all amounts then on deposit in the Deposit Account (including any Investment Securities then on deposit which have not matured) shall be paid to the Trustee for application in accordance with the provisions of the Bond Documents . . . ." (Id.) Section 9.20 of the Deposit Agreement contains a forum selection clause requiring all actions under the agreement to be litigated in the federal or state courts of New York, and the parties stipulated that the agreement is governed by New York law. (Id. § 9.20.)

If directed by EnCap to do so, § 6.01 of the NJEIT Indenture requires BNY to invest the Bond Proceeds in the funds created under the indenture, including the Project Fund, in "Investment Securities." (NJEIT Indenture § 6.01, Knight Decl., Ex. 1.) Section 2.02 of the Deposit Agreement states that the Bond Proceeds in the Deposit Account shall be invested in Investment Securities by BNY (as depository) as directed in writing by Lexington with copies to EnCap and the Secured Parties (Wachovia and BNY as indenture trustee). (Deposit Agreement § 2.02, Knight Decl., Ex. 8.) In order to facilitate the investment of the Bond Proceeds, EnCap, Lexington and BNY as indenture trustee entered into the NJEIT Series A Bonds Investment Agreement ("Investment Agreement"). (Investment Agreement, Kerr Aff., Ex. D.) The Investment Agreement defines "Invested Funds," as "the proceeds of the Bonds, on deposit in the '2005 NJEIT Bonds Account' within the 'Project Fund,' pursuant to the [NJEIT] Indenture . . . consisting of $61,158,154." (Id. at 4.) Setting forth EnCap's desire "to direct the Trustee to deposit the Invested Funds, pursuant to Section 6.01 of the Indenture, in the Deposit Account that has been created and established under the . . . [Deposit Agreement] and [to purchase] . . . Government Obligations as defined under the Indenture ('Investment

Securities') . . . in accordance with the provisions of the [NJEIT] Indenture, this

Agreement and the [Deposit Agreement]," the Investment Agreement provides that "the

Investment Securities (though owned by EnCap) shall be held and invested for the benefit

of the Company [Lexington], the Credit Facility Provider [Wachovia] . . . and the Trustee

[BNY], as their respective interests may appear and as further set forth in the [Deposit

Agreement]." (Id.)

Wachovia, EnCap and Commerce Bank entered into the Assignment of

Agreements Affecting Real Estate ("Assignment of Agreements") in order to induce

Wachovia to issue the Letters of Credit. (Assignment of Agreements at 4, Knight Decl.,

Ex. 7.) The Assignment of Agreements assigns EnCap's rights and benefits under a host

of agreements related to the Project, including the Deposit Agreement. (Id. at § 2, at 23.)

The Assignment of Agreements also assigns any "[a]ccounts . . . in any way related to or

arising in connection with" the assigned property. (Id. § 2(m).) Section 1 of the

agreement states:

> Assignment.  The Company [EnCap] hereby absolutely and presently
> assigns, transfers and sets over unto the Assignee [Wachovia and
> Commerce Bank] all of the Company's rights, title, privileges and
> interests in and to (but not the Company's obligations under) the Assigned
> Property (as hereinafter defined), and all rights and benefits therefrom
> whether now owned or hereafter created, or acquired or arising.  This
> Assignment is intended to be and shall constitute an unconditional,
> absolute and present assignment from the Company to the Assignee of all
> of the Company's right, title and interest in and to the Assigned Property,
> and not an assignment in the nature of a pledge of such Assigned Property
> or the mere grant of a security interest therein.

(Id. § 1.)  After setting forth the agreements and rights assigned in § 2, § 3 of the

Assignment of Agreements provides:

> Use of Assigned Property.  Notwithstanding that this Assignment is
> effective immediately, until the occurrence of an Event of Default

> hereunder or a default under the Reimbursement Agreement or the BCIA Indenture (collectively, an "Event of Default"), the Company may retain, use and enjoy the Company's benefits of the Assigned Property under a revocable license granted hereby, subject in all cases to **Section 6** hereof. After the occurrence and during the continuance of an Event of Default, the Assignee may enforce this Assignment immediately following express written notice to the Company.

(Id. § 3.)

The Assignment of Agreements states that it was entered into in connection with a number of "obligations" owed by EnCap to Wachovia.  (Id. at 3.)  Among the referenced obligations is EnCap's commitment under the Reimbursement Agreement to immediately repay draws on the Letters of Credit.  (Id. at 3-4.)  Section 7(f) provides that if an "Event of Default" occurs and is continuing, "the proceeds of any collection, enforcement, sale or other disposition of, or other realization upon, all or any part of the Assigned Property and any cash held in any deposit account shall be applied to satisfy the Obligations."  (Id. § 7(f).)

## C. EnCap's Defaults and the Other Proceedings

It is undisputed that EnCap is in default under the NJEIT Indenture, the BCIA Indenture, the BCIA Trust Loan Agreement, the Reimbursement Agreement and the Assignment of Agreements.  (Wachovia's Rule 56.1 Statement ¶ 15; Lexington's Response to Wachovia's Rule 56.1 Statement ¶ 15; 10/5/2007 Letter from NJEIT & NJDEP to James Dausch, Kerr Aff., Ex. G.)  Among its myriad defaults, EnCap defaulted under the Reimbursement Agreement by failing to cause $10,000,000 of the Bonds to be redeemed by June 15, 2007, as required by the NJEIT and BCIA Indentures.  (Knight Decl. ¶ 16.)  In August and September of 2007, draws amounting to $930,502.74 were made on the Letters of Credit to pay interest due on the Bonds.  (Id. ¶ 17.)  Instead of

immediately reimbursing Wachovia for the draws as required by the Reimbursement Agreement, EnCap informed Wachovia that it did not intend to comply with the Reimbursement Agreement and would not reimburse Wachovia for future draws. (Id.)

In letters dated June 19, 2007 and September 7, 2007, Wachovia notified EnCap of its defaults. (Id. ¶ 18.) After EnCap failed to cure the defaults, Wachovia instructed BNY and Commerce Bank as the indenture trustees to cause the Bonds to be tendered for mandatory purchase under the NJEIT and BCIA Indentures and the Bonds were purchased with draws on the Letters of Credit. (Id. ¶ 19.) As a result, EnCap now owes Wachovia as bondholder and as the "Credit Facility Provider" the principal owed on the Bonds of $107,015,000 and $37,985,000, plus interest and other charges. (Id.) As of July 7, 2009, EnCap owed Wachovia approximately $146,293,042 in principal and $18,218,805 in interest. (Id. ¶ 20.)

On December 19, 2007, Wachovia filed a complaint in foreclosure in the Superior Court of New Jersey, Bergen County Chancery Division (the "Bergen County Chancery Court") seeking to foreclose on the Project Site pursuant to the Mortgage and to determine the interests of other parties in Project Site (the "Bergen County Action"). (Affidavit of Gary S. Bush ("Bush Aff.") ¶ 2.) Wachovia named, among others, BNY, EnCap, Cherokee, SFT and Wells Fargo as defendants. On May 8, 2008, EnCap filed a voluntary petition for relief under Chapter 11 of Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Proceeding") and the Bergen County Action was accordingly stayed. (EnCap's Chapter 11 Petition, Declaration of H. Gregory Baker ("Baker Decl."), Ex. 2.)

Lexington filed an adversary proceeding in the Bankruptcy Proceeding on August 21, 2008, naming BNY, Wachovia, Wells Fargo and the NJMC as defendants ("the Adversary Proceeding"). (Lexington's Complaint, Baker Decl., Ex. 3.) In its complaint, Lexington sought a declaration that BNY and Wachovia do not have perfected security interests in the Bond Proceeds and that, in any event, under the Deposit Agreement the Bond Proceeds cannot be removed from the Deposit Account except to pay closure costs at Lexington's direction. (Id. at 13.) The complaint states that "[t]his is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),(K) & (M)," and that venue and jurisdiction are proper in the New Jersey Bankruptcy Court. (Id. ¶¶ 12, 13.)

BNY responded to Lexington's complaint on October 17, 2008 by filing an answer which included counter-, cross-, and third-party claims against Lexington, EnCap, Cherokee, AHA, and EnCap's affiliate, NJM Capital, LLC. (BNY's Answer & Counterclaims/Crossclaims/Third-Party Claims ("BNY's Adversary Proceeding Answer"), Baker Decl., Ex. 4.) Through its counterclaims against Lexington, BNY sought a declaration that, among other things, the Deposit Account is subject to BNY's perfected security interest and authorizing to it to apply the Bond Proceeds to pay Wachovia as holder of NJEIT 2005A Bonds. (Id. at 33-36.) In its answer, BNY admitted that the Adversary Proceeding was core, but did not respond to Lexington's assertions regarding venue and jurisdiction. (Id. at 5.) While BNY did not raise improper venue as an affirmative defense, its sixth defense states that "[b]y way of contract and or conduct, Plaintiff has assented to treatment contrary to the relief sought in the Complaint." (Id. at 13.)

Acting on Wachovia's motion, on February 3, 2009, the New Jersey Bankruptcy Court dismissed EnCap's bankruptcy case for failure to file a confirmable plan. In re Golf Holdings, LLC, No. 08-18581, (Bankr. N.J. Feb. 3, 2009) (order granting Wachovia's motion to dismiss). A week later, the Bankruptcy Court also dismissed the Adversary Proceeding, which had barely progressed past the pleading stage. Lexington Insurance Company v. Bank of New York (In re EnCap Golf Holdings, LLC), No. 08-2143, (Bankr. N.J. Feb. 19, 2009) (order dismissing Adversary Proceeding). Anticipating the dismissal of the Adversary Proceeding, on January 19, 2009, Lexington's counsel wrote to BNY's counsel suggesting that BNY file a federal interpleader action to resolve the dispute over the Bond Proceeds. (1/19/2009 Letter from Scott Shelly to Curtis Plaza, Kerr Decl., Ex. H.) Rather than BNY file an interpleader action, Wachovia commenced this action on February 11, 2009. Notwithstanding its suggestion that BNY file an interpleader action, in a March 16, 2009 letter to this Court, Lexington expressed its desire to file a motion to dismiss or stay this action in favor of the Bergen County Action. (3/16/2009 Letter to the Court, Baker Decl., Ex. 5.)

On March 27, 2009, AHA and Lexington filed a Contesting Answer in Intervention and Amended Counterclaims, Crossclaims and Third-Party Complaint ("Contesting Answer") in the Bergen County Action. (Contesting Answer, Baker Decl., Ex. 6.) In the Contesting Answer, Lexington and AHA asserted a declaratory judgment claim against Wachovia, BNY, Wells Fargo, SFT and Cherokee seeking a declaration regarding the parties' rights to the Bond Proceeds under the Deposit Agreement. (Id. at 40.) In response to the Contesting Answer and the March 16, 2009 letter to this Court, BNY submitted a "Notice of Default" to Lexington. (Notice of Default, Baker Decl., Ex.

7.) The Notice of Default states that by requesting to file a motion to dismiss or stay this action, and by asserting a claim under the Deposit Agreement in Bergen County Action, Lexington had defaulted under the forum selection clause in § 9.20 of the Deposit Agreement. (Id.) Pursuant to § 7.01(c) of the Deposit Agreement, Lexington was given thirty days to cure. (Id.) Lexington then withdrew its letter requesting to file a motion to dismiss or stay this action and filed a notice of dismissal dismissing its claim in the Bergen County Action. (3/31/2009 Lexington Letter to the Court, Baker Decl., Ex. 9; Notice of Dismissal, Baker Decl., Ex. 8.)

While as of March 30, 2009, Lexington was no longer a party to the Bergen County Action, AHA continued to pursue its declaratory judgment claim regarding the Bond Proceeds. Wachovia filed a motion to strike AHA's claim, which BNY joined. (Motion to Strike the Amended Pleading in Intervention of AHA ("Motion to Strike"), Bush Aff., Ex. 1.) BNY also moved to dismiss, arguing that it was not a proper party to the action because it has no interest in the Project Site. (Motion to Dismiss Certain Counts, Bush Aff., Ex. 2). The Bergen County Court held a hearing on the motions, and after noting that the forum selection clause in the Deposit Agreement calls for litigation to take place in New York, concluded that the all claims against BNY would be dismissed and that the issue of the Bond Proceeds would be decided by this Court. (5/15/2009 Bergen County Chancery Court Hearing Tr. at 38:6-11, 73:19-74:2.) In two orders dated June 24, 2009, the Bergen Count Chancery Court granted Wachovia's and BNY's motions, dismissed all of AHA claims concerning the Bond Proceeds, and stated that to the extent Wachovia recovers any portion of the Bond Proceeds in this action, such recovery will reduce EnCap's indebtedness to Wachovia under the Mortgage.

(Order to Dismiss Certain Counts of the Amended Pleading in Intervention of AHA and Order to Strike the Amended Pleading in Intervention of AHA, Bush Aff., Ex. 4, 5.) Thus, BNY and Lexington are no longer parties in the Bergen County Action.

## II. The Pleadings

Wachovia's six-count Complaint asserts declaratory judgment claims against EnCap, BNY and Lexington. Wachovia asks the Court to declare: Count I, that Wachovia is entitled to immediate turnover of the remaining Bond Proceeds; Count II, that Wachovia has an enforceable lien on the remaining Bond Proceeds; Count III, that the Deposit Agreement is not a bar to immediate turnover of the remaining Bond Proceeds; Count IV, that the Deposit Agreement is not a bar to BNY's right of offset; Count V, in the alternative, that in the event the terms of the Deposit Agreement bar Wachovia from recovering the remaining Bond Proceeds, Wachovia is nevertheless entitled to the immediate turnover of the Proceeds because continued maintenance would be futile; and Count VI, in the alternative, that in the event the terms of the Deposit Agreement bar Wachovia from recovering the remaining Bond Proceeds at this time, Wachovia is entitled to payment on March 21, 2013. (Compl. at 13-19.)

In its three-count Crossclaim, BNY asserts declaratory judgment claims against EnCap and Lexington. BNY seeks the following declarations: Count I, authorizing turnover of the Bond Proceeds for payment on the NJEIT 2005A Bonds; Count II, authorizing setoff and recoupment against amounts held in the Deposit Account for payment on the NJEIT 2005A Bonds; and Count III, that due to EnCap's defaults, no party has a right to use the funds in the Project Fund or its related accounts, including the Deposit Account, for remediation of the Project. (BNY Crossclaim at 32-37.)

Count I of Lexington's three-count "Counterclaim and Crossclaim" is asserted against Wachovia, BNY, EnCap, MACTEC, Cherokee, SFT and Wells Fargo and seeks a declaration that BNY and Wachovia's purported security interest in the Bond Proceeds have not been properly perfected, and that BNY and Wachovia are prohibited from disbursing, transferring or otherwise removing the Bond Proceeds from the Deposit Account except to pay closure costs. (Lexington's Counterclaim and Crossclaim at 29-30.) Counts II and III of Lexington's Counter and Crossclaim are asserted solely against BNY and seek declarations: Count II, that BNY is estopped from, or has waived, its right to assert that the forum selection clause of the Deposit Agreement precludes litigation of any dispute thereunder, including this dispute, in any forum other than the state or federal courts of New York; and Count III, that BNY is prohibited from disbursing, transferring or removing the Bond Proceeds from the Deposit Account during the pendency of this litigation, or any litigation between the parties to the Deposit Agreement that arises from the Deposit Agreement, except to pay closure costs at Lexington's direction. (Id. at 30-32.)

Wachovia invokes the Court's diversity jurisdiction. See 28 U.S.C. § 1332. BNY's and Lexington's counterclaims and crossclaims are founded in the Court's diversity and supplemental jurisdiction. See id.; 28 U.S.C. § 1367. The parties do not contest jurisdiction. As noted, Wachovia and BNY move for summary judgment on all of their claims. Lexington moves for partial summary judgment on Count II of its Counterclaim and Crossclaim.

## DISCUSSION

### III. Legal Standard

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

The same standard of review applies when the court is faced with cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.

2001). Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration. Id.

The purpose of a declaratory judgment "is to clarify and settle disputed legal relationships and to relieve uncertainty, insecurity and controversy." Broadview Chem. Corp. v. Lovtite Corp., 474 F.2d 1391, 1393 (2d Cir. 1973). With certain exceptions, not applicable here, "[i]n a case or actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). But simply because a federal court could decide a declaratory judgment action does not necessarily mean that it should: "Courts have consistently interpreted th[e] permissive language of [§ 2201(a)] as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003).

In determining whether to hear an action for declaratory judgment, the Second Circuit has directed district courts to ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Duane Reade Inc. v. St. Paul Fire & Marine Ins., 411 F.3d 384, 389 (2d Cir. 2005). The Court of Appeals has noted that other circuits have built on this test and also inquire into: "(1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3)

whether there is a better or more effective remedy." <u>Dow Jones & Co.</u>, 346 F.3d at 359-60.

## IV. The Forum Selection Clause

There is a "strong public policy" in favor of enforcing forum selection clauses, <u>Roby v. Corp. of Lloyd's</u>, 996 F.2d 1353, 1361 (2d Cir. 1993), and as such, waiver of a forum selection clause "should . . . not be found lightly." <u>Jockey Int'l, Inc. v. M/V "Leverkusen Express"</u>, 217 F. Supp. 2d 447, 455 (S.D.N.Y. 2002). Indeed, "because forum selection clauses may result in a waiver of substantive and procedural rights, it would be unfair to infer such a significant waiver absent clear indication of intent through the party's action." <u>Ferraro Foods Inc. v. M/V Izzet Incekara</u>, No. 01 Civ. 2682(RWS), 2001 WL 940562, at *4 (S.D.N.Y. Aug. 20, 2001).

This Court has explained that a "'forum selection clause will be deemed waived if the party invoking it has taken actions inconsistent with it, or delayed its enforcement, and other parties would be prejudiced.'" <u>In re Rationis Enters., Inc.</u>, No. 97 CV 9052(RO), 1999 WL 6364, at *2 (quoting <u>In re Deleas Shipping Ltd.</u>, 1996 AMC 434, 436 (W.D. Wash. 1995)). In the context of considering whether a party has waived enforcement of a forum selection clause through its pretrial conduct, "[c]ourts have found implied waiver of venue where a party has repeatedly represented that venue is appropriate . . . or actively pursued substantive motions." <u>Diesel Pops S.R.I. v. Greystone Bus. Credit II LLC</u>, No. 07 Civ. 9580(HB), 2008 WL 4833001, at 15 (S.D.N.Y. Nov. 5, 2008). On the other hand, "no waiver has been found where parties merely participated in pretrial motions, moved to dismiss after discovery has been completed, or where the opposing party was not prejudiced by the dismissal." <u>Ferraro</u>

Foods, 2001 WL 940562, at *4 (citing Sherman v. Moore, 86 F.R.D. 471, 473-74 (S.D.N.Y. 1980) (collecting cases)).

Ultimately, "[t]he inquiry courts use to determine whether a party has waived his right to challenge venue is fact specific." Krape v. PDK Labs Inc., 194 F.R.D. 82, 86 (S.D.N.Y. 1999). And there is no bright-line rule for determining whether waiver has or has not occurred. Id. "[W]hen a party disregards a forum selection clause and sues on a contract in an unauthorized forum, it waives the forum selection clause only for the specific claim it pursues." Pirolo Bros., Inc. v. Angelo Maffei & Figli, SAS, No. 87 Civ. 7561(MBM), 1989 WL 20945, at *2 (S.D.N.Y. Mar. 2, 1989); see Silverman v. Carvel Corp., 192 F. Supp. 2d 1, 7 (S.D.N.Y. 2001). Questions relating to the enforcement of forum selection clauses are "'essentially procedural, rather than substantive, in nature,' thus, federal law governs . . . ." Indem. Ins. Co. of N. Am. v. K-Line Am., Inc., No. 06 Civ. 0615(BSJ), 2008 WL 4922327, at *6 (S.D.N.Y. Feb. 27, 2008) (internal citation omitted) (quoting Jones v. Weibrecht, 901 F.2d 17, 19 (2d Cir. 1990)).

Lexington seeks a declaration that BNY has waived the forum selection clause in the Deposit Agreement which calls for disputes to be litigated in either state or federal court in New York. If waiver is found, Lexington says that it intends to move for the Court to abstain from hearing this action in favor of the Bergen County Action under the "Brillhart/Wilton abstention" doctrine. See Wilton v. Seven Falls Co., 515 U.S. 277 (1995); Brillhart v. Excess Ins. Co. of America, 316 U.S. 491 (1942).[2] Without a

---

[2] "Brillhart/Wilton abstention . . . only applies to declaratory judgment actions." State Farm Mut. Auto. Ins. Co. v. Schepp, 616 F. Supp. 2d 340, 347 (E.D.N.Y. 2008). When a federal declaratory judgment action is pending at the same time as parallel state court action, abstention under Brillhart and Wilton may be called for. In considering a motion based on Brillhart/Wilton abstention, "the question for the district court presented with a declaratory judgment suit, is 'whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can be better

declaration that BNY has waived the forum selection clause, Lexington runs the risk of defaulting under the Deposit Agreement, if it files a motion to abstain. Lexington argues that BNY waived enforcement of the forum selection clause by litigating in the Adversary Proceeding. Specifically, "[b]y failing to object to the New Jersey Bankruptcy Court as the forum for the adversary proceeding, failing to raise forum as an affirmative defense, and by asserting counterclaims against Lexington that arose under the Deposit Agreement." (Lexington's Mem. in Supp. Mot. for Partial Sum. J. at 7.) Lexington's waiver argument falls flat.

First, this Court has held that the assertion of a counterclaim based on a contract containing a forum selection clause in a related action does not, in itself, waive enforcement of a forum selection clause in a subsequent action. In United States Fidelity & Guarantee Co. v. Petroleo Brasileiro S.A., No. 98 Civ. 3099(JGK), 2001 WL 300735 (S.D.N.Y. Mar. 27, 2001), the crossclaim defendant was party to a contract with the crossclaimants which contained a forum selection clause. Invoking the forum selection clause, the crossclaim defendant moved to dismiss the crossclaims asserted against it under the contract. Id. *13. The crossclaimants agued that the crossclaim defendant had waived enforcement of the clause by "affirmatively rais[ing] counterclaims in the companion action based on identical facts and circumstances as those forming the basis of the cross-claims . . . ." Id. at *17. Finding the crossclaimants argument to be "without merit," Judge Koeltl held that "[t]he fact Petrobas/Brasiol [the crossclaim defendant] filed counterclaims in the companion action, in which it was entitled to defend itself . . . did not waive its affirmative defense in this case." Id. (citing Rogen v. Memry Corp., 886 F.

---

settled in the state court.'" Youell v. Exxon Corp., 74 F.3d 373, 375 (2d Cir. 1996) (quoting Brillhart, 316 U.S. at 495).

Supp. 393, 396 (S.D.N.Y. 1985)). The fact BNY asserted counterclaims concerning the Deposit Agreement in the Adversary Proceeding – which was commenced by Lexington and in which BNY was entitled to defend itself – did not waive its right to enforce the forum selection clause.

Second, the fact the Adversary Proceeding was a "core" bankruptcy proceeding militates against finding waiver. While Lexington points out that it is not settled in the Third Circuit whether forum selection clauses are enforceable in core bankruptcy proceedings, the case law indicates that the ability to enforce forum selection clauses in such proceedings is, at a minimum, circumscribed. In In re Exide Technologies, 544 F.3d 196 (3d Cir. 2008), the Third Circuit considered whether certain claims in a bankruptcy proceeding were core or non-core. The Court stated that "[w]hether claims are considered core or non-core proceedings dictates . . . the enforcement of forum selection clauses." Id. at 206 (citing Diaz Contracting, Inc. v. Nanco Contracting Corp (In re Diaz Contracting, Inc.), 817 F.2d 1047, 1051-53 (3d Cir. 1987)). The Court explained that if the claims were non-core, enforcement of the forum selection clause at issue would be appropriate. Id. While remanding to the bankruptcy court to determine whether the claims were core or not, the Court stated that:

> A forum-selection clause is presumptively valid and will be enforced unless the party objecting to its enforcement demonstrates that enforcement of the clause would violate a strong public policy of the forum. Where the claims at issue are not "core" bankruptcy matters, this rule applies equally to Chapter 11 debtors. Here, the Coordinating Agreement specifies that the parties will file any suits arising out of the sales agreements to a state of federal court in Cook County, Illinois. If the claims at issue are non-core, this forum selection clause should be enforced.

Id. at 218 n.15 (internal citations omitted).  Thus, by negative implication, the Third

Circuit indicated that if a claim is core, forum selection clauses should not be enforced, or

at least, forum selection clauses are not as readily enforceable.

Further, while obviously not binding on the courts of the Third Circuit, this Court

has held that "although there is a strong public policy favoring the enforcement of forum

selection clauses in this Circuit, this policy is not so strong as to mandate that forum

selection clauses be adhered to where the dispute is core."  In re Iridium Operating LLC,

285 B.R. 822, 837 (S.D.N.Y. 2002).  But see D.E. Frey Group, Inc. v. FAS Holdings, Inc.

(In re D.E. Frey Group, Inc.), 387 B.R. 799, 806 (D. Colo. 2008) ("Enforcing an

arbitration clause does not jeopardize the policy underlying the Bankruptcy Code's

preference for centralization of disputes concerning the bankruptcy estate, even in core

civil proceedings.").  At a minimum, the uncertainty as to whether forum selection

clauses are enforceable in core bankruptcy proceedings in the Third Circuit cuts against

finding that BNY's actions in the Adversary Proceeding constitute a "clear indication of

intent" to waive enforcement of the forum selection clause.  Ferraro Foods, 2001 WL

940562, at *4.

Third, while BNY did not explicitly raise improper venue or the forum selection

clause in its answer in the Adversary Proceeding, its sixth defense states: "By way of

contract and conduct, Plaintiff has assented to treatment contrary to the relief sought in

the complaint."  (BNY Answer in the Adversary Proceeding ¶ 69, Baker Decl., Ex. 4.)

And BNY's tenth defense provides: "BNY herby gives notice that it intends to rely upon

any additional affirmative defense that becomes available or apparent during discovery

and/or litigation of this Complaint and BNY's Counter/Crossclaims/Third-Party Claims

and, thus, reserves the right to assert such additional defenses." (Id. ¶ 73.)  Assuming the forum selection clause was enforceable in the Adversary Proceeding, these defenses arguably could have preserved BNY's right to rely on the forum selection clause had it moved for enforcement.  See, e.g., LPR, SRL v. Challenger Overseas, LLC, No. 99 Civ. 8883(JGK), 2000 WL 973748, at *6-7 (S.D.N.Y. July 13, 2000) (forum selection clause not waived where contract containing clause cited generally in affirmative defense).  The Adversary Proceeding was, however, dismissed soon after pleading stage and the Court will not attempt to divine whether the New Jersey Bankruptcy Court would have found BNY to have preserved its right to enforce the forum selection clause.

Finally, in its letter of January 19, 2009, Lexington suggested that BNY file an interpleader action in federal court in order resolve the dispute over the Bond Proceeds. (1/19/2009 Letter from Scott Shelly to Curtis Plaza, Kerr. Decl., Ex. H.)  Lexington is therefore hard pressed to argue that it is prejudiced by enforcement of the forum selection clause.  See Ferraro Foods, 2001 WL 940562, at *4; In re Rationis Enters., Inc., 1999 WL 6364, at *2.

BNY's conduct as a defendant in the Adversary Proceeding commenced by Lexington does not amount to a clear indication of intent to waive the forum selection clause in the Deposit Agreement and the Court accordingly finds that BNY has not waived the forum selection clause.  The Court also notes that what Lexington seeks to accomplish though its motion for partial summary judgment makes little sense.  The dispute between BNY, Wachovia and Lexington over the Bond Proceeds has – because of Lexington – already been before two New Jersey courts: the New Jersey Bankruptcy Court and the Bergen County Chancery Court.  Now that the dispute is before the court

the forum selection clause says it should be before, Lexington wants to return, once again, to the Bergen County Chancery Court – the same court which recently declined to consider the very issue Lexington seeks to raise. Indeed, BNY and Lexington are no longer parties in the Bergen County Action. This matter was meant to be decided here and now it will be. Lexington's motion for partial summary judgment is denied.

## V. The Bond Proceeds

Wachovia and BNY contend that they have security interests in, and are entitled to, the Bond Proceeds in the Deposit Account under the NJEIT Indenture, the Reimbursement Agreement and the Assignment of Agreements. They argue that under these agreements, when read together with all the agreements entered on December 1, 2005, it is clear that the Bond Proceeds are available to pay the Bonds and to reimburse Wachovia for draws on the Letters of Credit. Neither Lexington nor MACTEC expressly dispute that that Wachovia and BNY have security interests in the Bond Proceeds. And Lexington admits that the funds on deposit in the Deposit Account are collateral for the obligations owed by EnCap to Wachovia and BNY. (Lexington's Resp. to BNY's and Wachovia's Mots. Summ. J. at 30 n.11.) Lexington also admits that it has no interest in the Bond Proceeds; indeed, at oral argument, Lexington's counsel candidly admitted that "[w]e're here to protect the interests of American Home . . . ." (OA Tr. 22:1-2.)

Lexington's argument is that when the Deposit Agreement is viewed in light of all the agreements entered into on December 1, 2005, in addition to the structure of the Project's financing, the Deposit Agreement should be read to require that the Bond Proceeds remain in the Deposit Account until the Deposit Agreement expires because remediation of the Project Site may still occur and because the Deposit Agreement may

still be assigned. According to Lexington, Wachovia and BNY have rights to the Bond Proceeds, but only if they assume EnCap's obligations under the Deposit Agreement. Lexington also posits that because BNY's security interest in the Deposit Account is unperfected, BNY "cannot claim a valid and perfected security interest." (Id. at 31.)

MACTEC contends that it is owed approximately $33 million for work done on the Project prior to EnCap's default. According to MACTEC, it should be paid by Lexington from the Bond Proceeds in the Deposit Account.

The parties agree that because agreements entered into on December 1, 2005 in connection with EnCap's refinancing are part of a single, integrated transaction, the agreements must be read together. See This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998). The NJEIT Indenture grants Wachovia and BNY security interests in the Bond Proceeds, and under the NJEIT Indenture the Bond Proceeds are trust funds. (NJEIT Indenture at 7-8, 32, § 5.02.) The Reimbursement Agreement grants Wachovia a security interest in "all income, earnings, profits, premium, or other payment in whatever form in respect of," and "all proceeds (cash and non-cash) arising out of the sale, exchange collection, enforcement or other disposition of all or any portion of," the Bonds purchased with draws on the Letters of Credit. (Reimbursement Agreement § 9.1, Knight Decl., Ex. 6.) Under the Assignment of Agreements, if EnCap defaults, "any cash held in any deposit account" is to be applied to reimburse Wachovia for draws on the Letters of Credit. (Assignment of Agreements, § 7(f), Knight Decl., Ex. 7.) When EnCap executed the Assignment of Agreements, thereby assigning the Deposit Agreement to Wachovia,

EnCap also assigned all "[a]ccounts . . . in any way related to or arising in connection with," the Deposit Agreement. (Id. § 2(m).)[3]

Neither Lexington nor MACTEC seriously dispute that the security interests granted to Wachovia and BNY in the Bond Proceeds have attached. See N.Y. U.C.C. § 9-203(a),(b); N.J. Stat. Ann. § 12A:9-203(a),(b).[4] Lexington and BNY debate whether the Deposit Account is part of the Project Fund created under the NJEIT Indenture, and if it is not, whether the Bond Proceeds in the Deposit Account are "proceeds" of the Project Fund. This, however, is immaterial because the security interests granted to BNY and Wachovia under the NJEIT Indenture in the "monies and investments" in the Project Fund were not extinguished when the Bond Proceeds were transferred to the Deposit Account. (NJEIT Indenture § 5.02, Knight Decl., Ex. 1.) Indeed, Lexington asserts that "[t]he corpus of the money that constitutes the 'collateral' was simply moved to the Deposit Account, and is now being held by BNY in a different capacity. The Deposit

---

[3] Lexington argues that the Assignment of Agreements did not effect an outright assignment, but instead merely granted Wachovia a security interest in the purportedly assigned property. As discussed below, the Assignment of Agreements effected an outright assignment.

[4] The parties do not address choice of law, but both New Jersey and New York have adopted Revised Article 9 of the Uniform Commercial Code ("U.C.C.), and the provisions governing the attachment and perfection of security interests are the same. See In re Nittolo Land Dev. Ass'n, 333 B.R. 237, 240 (Bankr. S.D.N.Y. 2005) ("Revised Article 9 became effective in New York on July 1, 2005."); Wawel Sav. Bank v. Jersey Tractor Trailer Training, Inc. (In re Jersey Tractor Trailer Training, Inc.), 580 F.3d 147, 149 n.2 (3d Cir. 2009) ("New Jersey has adopted the Revised Article 9 of the Uniform Commercial Code for secured transactions."). All of the relevant December 1, 2005 refinancing agreements contain choice of law provisions: the NJEIT Indenture designates New Jersey law (NJEIT Indenture § 12.12 and at 30, Knight Decl., Ex. 1); the Reimbursement Agreement designates New York law (Reimbursement Agreement § 11.12, Knight Decl., Ex. 6); the Assignment of Agreements designates New Jersey law (Assignment of Agreements § 18, Knight Decl., Ex. 7); and the Deposit Agreement designates New York law (Deposit Agreement § 9.20, Knight Decl., Ex. 8).

"Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules . . . ." Stuart v. Am. Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998). New York courts honor choice of law provisions in security agreements so long as the "chosen state has some relation to the [a]greement." Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.), 76 B.R. 297, 301 n.1 (Bankr. S.D.N.Y 1987); see also N.Y. U.C.C. § 1-105(1) ("when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."). Thus, any questions relating to the validity or existence of BNY and Wachovia's security interests are governed by the law of the state (New York or New Jersey) chosen in the relevant agreement.

Account Funds are not 'proceeds' of that collateral – they *are* that collateral."
(Lexington's Resp. to Wachovia's and BNY's Mots. Summ. J. at 30 n.11.)

　　　　Lexington looks to § 2.01 of the Deposit Agreement and argues that it controls the
funds in the Deposit Account until the Deposit Agreement expires in March, 2013, or
until it is in default.  Section 2.01 does provide that unless Lexington is in default, BNY
as depository shall "deal with the Deposit Account as directed" by Lexington.  (Deposit
Agreement § 2.01, Knight Decl., Ex. 8.)  But nothing in the Deposit Agreement purports
to extinguish, or even limit, BNY's and Wachovia's security interests in the Bond
Proceeds in the Deposit Account.  On the contrary, the Deposit Agreement expressly
recognizes Wachovia and BNY as secured parties with rights to the collateral provided
by the NJEIT Indenture and the other agreements.  BNY and Wachovia are included in
the Deposit Agreement's definitions of "directed secured parties" and "secured parties."
(Id. § 1.01(25), (69).)  Section 5.01, "Rights Upon Occurrence of Event of Default,"
acknowledges that a default under the NJEIT Indenture gives rise "to certain rights and
remedies being exercised by the Directed Secured Parties and the Trustee, against
collateral provided by EnCap (including without limitation, this Agreement) . . . ."  (Id. §
5.01.)  While Lexington argues that the only way Wachovia and BNY have a right to the
Bond Proceeds is if they "assume EnCap's obligations under the Deposit Agreement,"
(Lexington's Resp. to Wachovia's and BNY's Mots. Summ. J. at 28), § 5.01 states that in
the event EnCap defaults under the NJEIT Indenture, Wachovia and BNY "shall have the
right (but not the obligation) to exercise the rights otherwise provided to EnCap under
this Agreement . . . ."  (Deposit Agreement § 5.01, Knight Decl., Ex. 8.)

38

As acknowledged by Lexington's counsel at oral argument, Lexington's true interest in this litigation is to protect its sister company, AHA. According to Lexington, the Bond Proceeds "run with the land" and cannot be disbursed to pay Wachovia until AHA is released from performing under the Surety Bond. In support of this position, Lexington asks the Court to read the Deposit Agreement in light of events leading up AHA's decision to issue the Surety Bond and in light of the structure of the Project's financing. Staples, an AHA vice president, states that "[i]n issuing the Surety Bond, American Home relied upon the understanding that, in the event American Home was called to perform, the proceeds of the . . . [Lexington Policy] would be available to exonerate American Home." (Staples Decl. ¶ 5.) Radigan, an AIGE executive, asserts that "Lexington could only be made to give up control over the funds serving as security for bonds issued by an AIG company if EnCap first obtained the release of those bonds." (Radigan Decl. ¶ 14.) AHA's "understanding" is, however, flatly contradicted by the agreements entered on December 1, 2005. Examining the structure of the Project's financing, and reading the agreements entered on December 1, 2005 in unison, as the Court must, it is clear that in the event of EnCap's default, the Bond Proceeds were intended to be used as a source of payment for Bonds and to reimburse Wachovia for draws on the Letters of Credit.

Lexington's argument that Wachovia's security interests are not perfected is a red herring. The New York U.C.C. provides that "[e]xcept as otherwise provided in this chapter, a security agreement is effective according to its terms between the parties,

against purchasers of the collateral, and against creditors." N.Y. U.C.C. § 9-201(a).[5]

According to one noted treatise,

> [t]he sentence means what it says; the secured creditor, even an
> unperfected secured creditor, has greater rights in its collateral than any
> other creditor, unless the Code provides otherwise. A creditor without a
> security interest or a lien has no claim to any specific collateral, and 9-201
> gives an unperfected but *secured* creditor rights superior to the rights of
> that *unsecured* creditor.

4 James J. White & Robert S. Summers, Uniform Commercial Code § 33-2 (6th ed.

2010). In other words, "the secured creditor wins unless the competitor finds a rule that

says otherwise." Id. § 33-1. Lexington and MACTEC have not pointed to any rule that

says otherwise, and have not submitted any evidence that there are other creditors with

security interests in the Bond Proceeds. BNY and Wachovia have security interests in

the Bond Proceeds and because there are no other parties with superior interests, they are

entitled to the collateral.[6]

Lexington and MACTEC concede that because EnCap is in default, it can no

longer submit requisitions for payment from the Deposit Account under the NJEIT

Indenture and the Deposit Agreement. They argue, however, that parties other than

---

[5] Questions of perfection are governed by the law of New York, because "[w]hile collateral is located in a
jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection,
and the priority of a possessory security interest in that collateral." N.Y. U.C.C. § 9-301(b). In any event,
the New Jersey U.C.C. provides for the same result. See N.J. Stat. Ann. § 12:A:9-201(a).

[6] It is worth noting that while Lexington argues that BNY's and Wachovia's security interest in the Deposit
Account are unperfected, this does not control whether their security interests in the Bond Proceeds
themselves are perfected. Assuming BNY's security interest is in the Deposit Account, it is perfected
because BNY has control over the Deposit Account. See N.Y. U.C.C. § 9-312(b)(1) (security interest in
deposit account can only be perfected by control); § 9-314(b) (security interest in deposit account remains
perfected only while secured party retains control); § 9-104 (a)(1) (bank with which deposit account is
maintained has control). Lexington's argument that BNY ceded control over the Deposit Account to it by
entering the Deposit Agreement is completely unfounded. To wrest control from the depository bank
requires the "secured party" and the bank to agree in an authenticated record that the bank will comply with
the secured party's instruction with respect to the deposit account, or the secured party must become the
bank's customer with respect to the deposit account. See N.Y. U.C.C. § 9-104(a)(2)(3). Lexington is not a
"secured party," and so the Deposit Agreement has no effect on BNY's control over the Deposit Account.

EnCap may be able to utilize the Bond Proceeds in the future. According to Lexington, the Deposit Agreement may be assigned to the NJMC, and MACTEC may be entitled to payment from the Deposit Account for previously completed closure work. MACTEC contends that it is owed approximately $33 million for unpaid closure work, and that if AHA cures EnCap's defaults by performing on the Surety Bond, it will be subrogated to EnCap's rights under the Deposit Agreement.

In the Bergen County Action, Wachovia and the NJMC are litigating whether title to the Project Site has reverted to the NJMC. Lexington asserts that if title is found to have reverted to the NJMC, then EnCap can assign the Deposit Agreement to the NJMC and it can assume EnCap's rights under the agreement. There are two flaws with Lexington's position: § 9.05 of the Deposit Agreement requires Wachovia's and BNY's consent for EnCap to assign the agreement to the NJMC and the Deposit Agreement has already been assigned to Wachovia pursuant to the Assignment of Agreements.

Titled, "Assignment," § 9.05 of the Deposit Agreement provides:

Except as expressly provided herein, this Agreement may not be assigned by EnCap or the Depository without the Company's [Lexington] consent (which shall not be unreasonably withheld, delayed or conditioned). During any period that the NJEIT Series A Bonds remain outstanding, any consent by the Company shall be subject to the prior written consent of the Secured Parties.

Notwithstanding the foregoing, this Agreement may be assigned by EnCap without the Company's consent (a) to the NJMC in the event that fee simple title . . . reverts to the NJMC pursuant to the "Second Amended and Restated Landfill Closure and Development Agreement", by and between EnCap and the NJMC . . . (b) in connection with issuance of the NJEIT Series A Bonds, to the Secured Parties, or (c) with respect to the (i) "post-closure entity created by EnCap and the Developers to assume and carry out the "post-closure care" obligations with respect to the Phase I Site, and/or (ii) Developer(s) assignment of EnCap's rights to file Claims under this Agreement (as opposed to an assignment of the Agreement). However, any such assignment shall (except with respect to the

aforementioned assignment of rights to file Claims under (c)) assign this Agreement in its entirety.

In the event of assignment, EnCap shall provide written notice of such assignment to the Company and the Depository. <u>If such assignment is made pursuant to (a) or (c) above, and if any of the NJEIT Series A Bonds remain outstanding, such notice shall include the prior written consent of the Secured Parties.</u> Any notice of assignment shall be provided at least thirty (30) days prior to the effective date of the proposed assignment.

(Deposit Agreement § 9.05, Knight Decl., Ex. 8.) (emphasis added). Lexington makes a tortured argument for reading the third paragraph of § 9.05 to mean only that to the extent the "Secured Parties" consent to assignment is otherwise required, it must be included in the notice of the assignment to Lexington and BNY as depository. The more plausible reading is that if there is an assignment to a party other than the "Secured Parties," i.e., an "assignment made pursuant to (a) and (c)," then "the prior written consent of Secured Parties" must be included in the notice of assignment. But, because it would it would be nonsensical, if there is an assignment under (b), "to the Secured Parties," the Secured Parties' consent is not required.

In any event, EnCap has no rights to assign under the Deposit Agreement because all of its rights under the agreement were assigned to Wachovia through the Assignment of Agreements. Lexington argues that the Assignment of Agreements is too ambiguous to effect an absolute assignment and merely granted Wachovia a security interests in the Deposit Agreement. Under New Jersey law, which governs the Assignment of Agreements, "[a]n assignment is absolute if its language demonstrates an intent to transfer immediately the assignor's rights and title . . . ." <u>Jason Realty, L.P. v. First Fidelity Bank, N.A. (In re Jason Realty, L.P.)</u>, 59 F.3d 423, 428 (3d Cir. 1995). "It is also well-established under New Jersey law that an absolute assignment may have

conditions." Id. (citing Stanton v. Metro. Lumber Co., 152 A. 653, 654-55 (N.J. Ch. 1930)). The Assignment of Agreements was entered into to secure, among other things, EnCap's obligation to repay Wachovia for draws on the Letters of Credit. In a similar case, interpreting New Jersey law, this Court explained that "[a]n absolute assignment and a license to the assignor may certainly be used to secure a note; they simply provide the creditor with a greater degree of security than a lien." First Fidelity Bank, N.A. v. Eleven Hundred Metroplex Assocs., 190 B.R. 510, 513 (S.D.N.Y. 1995) (Sotomayor, J.). The Assignment of Agreements states in unequivocal terms that it is an absolute and present assignment, "and not an assignment in the nature of a pledge of such Assigned Property or the mere grant of a security interest therein." (Assignment of Agreements § 1, Knight Decl., Ex. 7.) The fact the agreement also states that it was entered to "secure satisfaction of the Obligations" does not change the absolute nature of the assignment. (Id. at 4.) This is made clear by § 3, which states that "[n]otwithstanding that this Assignment is effective immediately, until the occurrence of an Event of Default hereunder or a default under the Reimbursement Agreement or the BCIA Indenture . . . the Company [EnCap] may retain, use and enjoy the Company's benefits of the Assignment Property under a revocable license granted hereby . . . ." (Id. § 3.) Thus, the Assignment of Agreements effected an outright assignment of EnCap's rights under the Deposit Agreement and at the same time granted EnCap a license to use those rights until an event of default. As explained in Eleven Hundred Metroplex, such an arrangement is permissible under New Jersey law. There is no dispute that an event of default has occurred, and thus EnCap's license has been revoked and Wachovia is possessed of EnCap's rights under the Deposit Agreement. As such, EnCap can no longer assign the

Deposit Agreement to the NJMC because it has nothing to assign, and even if title to the Project Site is found to have reverted to the NJMC, in no event will the NJMC be able to access the Bond Proceeds in the Deposit Account.

In a similar vein, AHA will not be subrogated to EnCap's rights under the Deposit Agreement because EnCap no longer has any rights under the agreement. A "subrogee in effect steps into the shoes of an insured and can recover only if the insured likewise could have recovered." Standard Acc. Ins. Co. v. Pellecchia, 104 A.2d 288, 293 (N.J. 1954); see NYP Holdings, Inc. v. McClier Corp., 65 A.D.3d 186, 189, 881 N.Y.S.2d 407, 410 (App. Div. 1st Dep't 2009) ("If a claim is made pursuant to an insurers right to subrogation, the insurer stands in the shoes of the insured."). A subrogee's rights, however, "can rise no greater than those enjoyed by the assured." M&B Apartments, Inc. v. Teltser, 745 A.2d 586, 591 (N.J. Super. Ct. App. Div. 2000); see Hartford Accident & Indem. Co. v. CAN Ins. Cos., 99 A.D.2d 310, 312, 472 N.Y.S.2d 342, 344(App. Div. 1st Dep't 1984) ("An equitable assignee or subrogee, however, is vested with no greater or different right or remedy than possessed by its subrogor."). Because EnCap, the subrogor, no longer has any rights under the Deposit Agreement, AHA, the putative subrogee, cannot assume any rights under the Deposit Agreement. This being the case, AHA will not be able to authorize disbursements from the Deposit Account in the future.

As authorized by § 9.08 of the Deposit Agreement, and by the Closure Policy, MACTEC and Lexington are currently arbitrating MACTEC's claim to $33,731,505 in unpaid payment applications for closure work done on the Project. According to MACTEC, EnCap's defaults have no effect on its right to payment in connection with applications for payment submitted prior to September 13, 2007, the date it was notified

of EnCap's default. MACTEC concedes, however, the bulk of its applications were not certified by EnCap, the NJEIT and the NJDEP as required under the NJEIT Indenture and the Deposit Agreement. According to MACTEC, it is nevertheless entitled to payment because the applications complied with requirements of the MACTEC Contract. This, however, is irrelevant because any payments from the Bond Proceeds in the Deposit Account are controlled by § 5.05 of the NJEIT Indenture and § 9.15 of the Deposit Agreement – not the MACTEC Contract. (NJEIT Indenture § 5.05, Knight Decl., Ex. 1; Deposit Agreement § 9.15, Knight Decl., Ex. 8) Indeed, according to the undisputed testimony of BNY vice president Barbara Kaczamar, there is only one unpaid requisition submitted by EnCap which includes a MACTEC invoice, and that invoice is in the amount of $55,647.00. Lexington, the NJDEP and the NJEIT did not approve the full amount claimed, and BNY did not pay the $26,647.00 which was approved because EnCap was in default. (Declaration of Barbara Kaczmar ¶ 8.) MACTEC argues that its payments applications might be approved as required by the NJEIT Indenture and the Deposit Agreement in the future by AHA, or by Wachovia and BNY. But, as explained, AHA will not be subrogated to EnCap's rights under the Deposit Agreement because those rights have been assigned to Wachovia. Thus, AHA will not be able to submit requisitions in place of EnCap. And while § 5.02 of the Deposit Agreement authorizes BNY and Wachovia to submit claims for closure costs, nothing requires them to do so. (Deposit Agreement § 5.02, Knight Decl., Ex. 8.)

While MACTEC agues that "both the Closure Policy and the Deposit Agreement function essentially as a payment bond for MACTEC to claim against," (MACTEC's Resp. to Wachovia's Mot. Summ. J. at 14), this is not borne out in the relevant

documents. Under the NJEIT Indenture, BNY and Wachovia have security interests in the Bond Proceeds. The Assignment of Agreements provides that if EnCap defaults, funds in the Deposit Account are to be applied to reimburse Wachovia for draws on the Letter of Credit. Whether or not MACTEC is entitled payment for work done on the Project has no effect on Wachovia's and BNY's security interests; at best MACTEC is an unsecured creditor. The Court takes no position on the pending dispute between MACTEC and Lexington. Given EnCap's default, however, the Bond Proceeds are to be used to pay the Bonds and to reimburse Wachovia for draws on the Letters of Credit. Whatever MACTEC's rights may be, they cannot interfere with BNY's and Wachovia's rights.

BNY and Wachovia have valid security interest in the Bond Proceeds. No other party has right to use the Bond Proceeds in the Deposit Account for remediation of the Project. BNY is authorized to pay itself and Wachovia with the $42,308,322.80 remaining in the Deposit Account. BNY's and Wachovia's motions for summary judgment are granted.[7]

## CONCLUSION

For the foregoing reasons, Lexington's motion for partial summary judgment is DENIED. Wachovia's motion for summary judgment is GRANTED as to Counts I through III of the Complaint. The Court does not reach Counts IV though VI. BNY's motion for summary judgment is GRANTED as to Counts I and III of its Crossclaim. The Court does not reach Count II. It is DECLARED that Wachovia and BNY have

---

[7] At the oral argument, counsel for BNY stated that BNY would be satisfied with a declaration that it is entitled to foreclose on its security interest. (OA Tr. 20:15-23.) The Court does not reach the question of whether BNY is entitled to offset against the Bond Proceeds in the Deposit Account. Nor does the Court reach Wachovia's claims in the alternative in Counts V and VI of the Complaint. It is noted, however, that Lexington concedes Count VI seeking a declaration that Wachovia is entitled to the Bond Proceeds when the Deposit Agreement expires on March 21, 2013.

valid and enforceable security interests in the Bond Proceeds in the Deposit Account; no party has a right to use the funds in the Deposit Account for remediation of the Project; Wachovia is entitled to immediate turnover of the remaining Bond Proceeds; and BNY is authorized to pay itself with the Bond Proceeds and to turnover the Bond Proceeds to pay Wachovia. In light of the foregoing, Lexington's claims in Counts I and III of the Counterclaim and Crossclaim are moot. Wachovia and BNY are directed to submit a proposed order of judgment on ten days notice.

Dated: New York, New York
February _19_, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge